UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| KRYSTEN A. OVERLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:08-cv-0662-SEB-TAB |
| vs. | ) | |
| | ) | |
| KEYBANK NATIONAL ASSOCIATION, | ) | |
| KEY INVESTMENT SERVICES, LLC, | ) | |
| KEYCORP INSURANCE AGENCY USA, | ) | |
| INC. (WA), KEYCORP INSURANCE | ) | |
| AGENCY USA, INC. (OH), KEYCORP | ) | |
| INSURANCE AGENCY USA, INC. (ID), | ) | |
| and KEYCORP INSURANCE AGENCY, | ) | |
| INC. (NY), | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Motion for Summary Judgment [Docket No.
66] filed by Defendants, Key National Association, Key Investment Services, LLC,
Keycorp Insurance Agency USA, Inc. (WA), Keycorp Insurance Agency USA, Inc.
(OH), Keycorp Insurance Agency USA, Inc. (ID), and Keycorp Insurance Agency, Inc.
(NY), on January 20, 2010; Defendants' Motion to Strike Surreply [Docket No. 123] filed
on May 28, 2010; and Plaintiff's Motion [sic] [Docket No. 127] filed on June 11, 2010.
Plaintiff Krysten A. Overly has brought this action alleging violations of Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., arising out of the
circumstances leading up to and surrounding her resignation from Defendant Key

Investment Services, LLC.  For the reasons detailed in this entry, Defendants' Motion for Summary Judgment is <u>GRANTED</u>; Defendants' Motion to Strike is <u>DENIED</u>; and Plaintiff's Motion is <u>DENIED</u>.

### *Factual Background*

Plaintiff Krysten Overly worked from 2004 to 2007 for Defendant Key Investment Services, LLC ("Key") and its corporate affiliate[1] as a financial advisor.  Key Regional Sales Manager Andrew Moulton was Overly's direct supervisor until his resignation in January 2007.  (Dep. of Overly at 49.)  On March 19, 2007, Rick Bielecki took over as Overly's supervisor.  (<u>Id.</u> at 90.)

### I. *Overly's Violations of Key Policies*

On March 29, 2007, shortly after Bielecki assumed his supervisory position, he was informed that Key employee Carol Cooney had engaged in a mutually agreed upon practice with Overly, whereby Cooney scanned Overly's signature into new customer account paperwork, rather than Overly signing the paperwork herself in the presence of the customer.  (Aff. of Bielecki ¶ 2.)  According to Overly, although this practice was prohibited by Key policy, it had been approved by her former supervisor, Moulton.  (Dep.

_____

[1]Overly first became employed as a financial advisor at McDonald Financial Group, a former Key affiliate, on February 23, 2004.  Key, a wholly owned subsidiary of KeyBank National Association, was formed in January 2006, at which time Overly was given the choice to stay at McDonald Financial Group or instead to work for Key; she chose the latter.  She was employed by Key as a financial advisor until her resignation on October 1, 2007.

of Overly at 120.)

As Regional Manager, Bielecki instituted a practice of accompanying financial advisors on "ride-alongs."  During one such trip on April 12, 2007, unaware that Bielecki already knew about her use of scanned signatures, Overly explained to Bielecki, unprompted, the process she used to scan and attach signatures, rather than signing certain forms herself.  (Dep. of Overly at 125, 126.)  She further explained that Moulton had previously approved of the practice, which she had used approximately twenty times in the previous year.  Id. at 123, 124.  Upon hearing this, Bielecki responded, "We need to put a stop on that . . . I need to go check and see, I'll get back with you."  (Id. at 126.)

During this conversation, Overly also told Bielecki that she encouraged Licensed Relationship Managers ("LRMs"), who assisted financial advisors with customers, to sell certain products that LRMs were prohibited from selling pursuant to Key policy.  (Aff. of Bielecki ¶ 3; Dep. of Overly at 127.)  During an investigation begun on April 16, 2007, a male LRM admitted to Key Compliance that he had recommended and sold prohibited variable annuity products to Overly's customers.  (Aff. of Foresta ¶ 4.)  He ultimately was fined $100 for this improper conduct.  (Id.)

The day after Overly's "ride-along," April 13, 2007, Bielecki and DePasquale called Overly to discuss her practices of scanning signatures and encouraging LRMs to sell outside the approved product list.  Overly once again told her supervisors that Moulton had approved of the signature scanning practice, but they informed her again that this conduct was against Key policy.  Dep. of Overly at 126.  She was asked if she

3

knew of any other financial advisors who also employed such practices, and she responded that she believed that at least one person, Kirk Green, had done so.  Id. at 131.[2] Overly later admitted, however, that she was never certain that any other financial advisor had, in fact, engaged in these prohibited practices.  (Id. at 131, 132.)

Bielecki reported to Key Compliance Overly's allegation that Green also had engaged in the prohibited signature practice.  (Aff. of Foresta ¶ 5.)  Bielecki called Green himself and questioned him regarding account opening procedures.  (Aff. of Bielecki ¶ 4.) Green denied ever having engaged in any of the alleged prohibited conduct, and Key's investigation into Green's conduct did not ultimately reveal evidence to substantiate Overly's allegations.  (Id.)

Because of Overly's use of the scanned signature and her practice of encouraging her LRMs to sell outside the product menu, Key Compliance recommended that her employment be terminated.  (Aff. of Foresta ¶ 6.)  Upon hearing of this recommendation, however, Bielecki and DePasquale defended Overly, expressing their wish that she retain her position at Key.  (Id.)  On May 17, 2007, Overly received a disciplinary memorandum and a $1,000 fine for her violation of Key policies.  She was not terminated for this conduct.  (Dep. of Overly at 77.)[3]

---

[2]On May 9, 2007, she participated in another conference call with her supervisors, during which she allegedly offered to compile a list of Financial Advisors who had scanned signatures in order to aid in Key's investigation of the matter, though she contradicted this assertion in later deposition testimony.  (Id. at 139.)

[3]The male LRM who admitted to participating in this misconduct was fined $100 as part (continued...)

## II.      *Overly's First Contact with Human Resources and Key's Territory Shift*

On May 30, 2007, Overly contacted a human resources representative at Key about her disciplinary memorandum as well as to report sexist remarks Bielecki made to her. (Id. at 162.)  Specifically, Overly complained that Bielecki had repeatedly called her "cutie."  (Id. at 161.)  Overly alleges in this litigation that Bielecki's conduct following her phone call with human resources was also discriminatory, including: that Bielecki ignored two of her requests for time off (though she still went on a planned vacation in one instance); that Bielecki somehow disabled the print function on her email (though she offers no explanation of this allegation); and that Bielecki transferred some of her most valuable sales territories to another employee.  (Id. at 273, 277-78, 284.)

The transition in sales territory began on July 26, 2007, when Bielecki informed his Central Indiana team (including Overly) that Key had hired Shaun Weyer as a financial advisor for the Central Indiana region.  Prior to the territory realignment that followed this hire on August 1, 2007, Overly had provided investment services at bank branches in Lebanon, Westfield, Noblesville, Riverview, Cicero, Fishers, and Parkside. (Id. at 198.)  After the shift, Overly continued to service Westfield, Noblesville, Riverview, and Cicero; Willow Lake and Zionsville were added to her territory, and Lebanon, Fishers, and Parkside were dropped.  (Id. at 199.)  Other financial advisors experienced similar losses and gains of specific territories.  (Id. at 199-200.)

---

[3](...continued)
of this disciplinary action.

After Bielecki hired Shaun Weyer, the financial advisors assigned to the Central Indiana region were Overly, Doug Ferry, Kirk Green, Deb Bohannon, Marshall Byers, and Weyer. (Id. at 92.)  The resultant allocation of branches for each financial advisor was as follows: Ferry had five branches; Bohannon had five branches; Green had five branches; Byers had seven branches; Weyer had six branches; and Overly had six branches.  Moreover, after the shift, the "core deposit base," which functions as a foundation for each advisor's revenue and commissions, was as follows: Ferry had $186,027,005; Bohannon had $110,798,221; Green had $147,617,964; Byers had $101,335,781; Weyer had $139,416,285; and Overly had $147,179,571.  According to Overly, despite this parity, her commissions decreased as a result of the shift in territories.

### III.    Overly's Second Complaint and Key's Response

Apparently upset about this change in her customer base, on August 7, 2007, Overly sent a letter to Key's CEO and other management, alleging discrimination and retaliation in connection with her disciplinary memorandum, Bielecki's "cutie" remarks, and Bielecki's decision to shift financial advisors' territories.  (Dep. of Overly (Ex. 13).) Two days later, on August 9, 2007, a Key human resources representative contacted Overly to inform her that the alleged discrimination would be investigated.  (Id. at 164.)

On August 22, 2007, Overly received a memorandum from Key, detailing the investigation into all of these occurrences.  The memorandum concluded: (1) that Key's investigation into her signature procedures confirmed that she had violated company

policy as well as National Association of Securities Dealers ("NASD") rules; (2) that

"Mr. Bielecki did refer to [Overly] as 'cutie' on several occasions" and "[Key]

determined that the use of this name is inappropriate and unprofessional, and . . .

addressed it accordingly . . ."; (3) that her other allegations of discrimination and

retaliation had not been substantiated; and (4) that "Mr. Bielecki is proceeding as required

by [Key] management to hire additional [Financial Advisors] within his region . . . ."  (Id.

(Ex. 15).)  According to Overly, after she sent the August 7 letter, Bielecki began

mistreating her in yet another manner, by denying her access to important client data.  (Id.

at 161, 291.)


**IV.    *Overly's New Business Plans***

During her initial May 30, 2007 phone call with human resources, Overly also

discussed her concern that she might "lose her license" if Key were bought by a larger

company.  (Dep. of Overly at 161.)  According to Overly, although Key's human

resources officer stated that she would speak to DePasquale about this possibility, she

also cautioned Overly not to bring up such complaints and then stated, "Off the record?

I'd put your head down and just go back to work and act as though everything's fine."

(Id. at 161-62.)

In response to this and earlier occurrences that apparently left her dissatisfied with

her position at Key, Overly made plans for establishing her own new business.  (Id. at

18.)  As early as April 2007, Overly and LRM Deborah Beaudin had begun forming a

plan to start such an enterprise.  They contacted Cliff Harris, an acquaintance of Overly's working at Woodbury Financial Services, Inc., on April 12, 2007, in order to determine if he would become their broker for the new business.  (Dep. of Overly at 366-367.)  Overly met with Harris at least once in the months following this initial contact.

While still employed by Key, Overly filed a Certificate of Organization for the planned company, Prosperity Financial Advisors, on September 7, 2007.  (Id. at 18, 329.) The following day, she purchased laptops for herself and Beaudin to be used in the business venture, (id. at 329, 330), and Overly formally enrolled in a brokerage program with Woodbury Financial on September 11, 2007.  (Id. at 332.)  Prosperity Financial Advisors received an Employer Identification Number from the Internal Revenue Service on September 20, 2007. (Id.)  Overly began working for Prosperity Financial Advisors immediately after resigning her position at Key in October of 2007.

## V.    *Overly's Resignation*

Overly attended a Key company outing to New Orleans on the weekend of September 27, 2007.  (Id. at 181.)  Upon returning to work in Indiana on October 1, 2007, she tendered her resignation to Bielecki, which read:

> Dear Key Investments,
>
> I would like to inform you that I am resigning from my position as Financial Advisor for Key Investments effective October 1, 2007.  Thank you for the opportunities for professional and personal development that you have provided me during the past 3 years and 8 months.  I have enjoyed working for the company and appreciate the support provided me during my tenure with

the company.  I would like to request that my last commission check and remaining vacation time be paid to me.  If I can be of any help during the transition, please let me know.

Sincerely,
Krysten A. Overly

(Id. (Ex. 18).)

According to Overly, when she informed Bielecki of her decision to resign, he applauded and "manhandled" her.  In addition, at least one coworker avers that she overheard yelling emanating from Bielecki's office.  (Dec. of Cooney ¶ 25.)  According to Overly, when she left the office, Bielecki said, "Good riddance, bitch."  (Id. at 236.) The following day, October 2, 2007, Overly began working for Prosperity Financial Advisors, along with Beaudin.

Overly filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on October 16, 2007, and the EEOC issued a notice of right to sue on January 31, 2008.  Subsequently, Overly filed a second charge of sex discrimination and retaliation on March 14, 2008, making the same or similar allegations.  The EEOC issued a second notice of right to sue on November 24, 2008. Overly filed her Complaint in Hamilton Superior Court on May 1, 2008, and Defendants removed the case to this Court on May 20, 2008.

## *Legal Analysis*

**I.**    ***Motions to Strike***

*A.    Plaintiff's Declarations*

Defendants have interposed two motions to strike, one contained within their Reply brief and the other filed independently.  In their Reply brief, Defendants contend that the declarations submitted by Overly are inadmissible as improperly authenticated. Each of the declarations Overly submitted contains the following affirmation: "I affirm under the penalties of perjury that the foregoing is true, and accurate to the best of my knowledge."  Defendants contend that this fails to conform to the applicable federal standard form for affirmations of unsworn declarations: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct."  28 U.S.C. § 1746.

Courts have held that a "to the best of my knowledge" formulation is insufficient, but this bar to admissibility typically applies only when such declarations are not also supported by an affirmation by the declarant that the declaration is based on her "personal knowledge." America's Best Inns, Inc. v. Best Inns of Abilene, L.P., 980 F.2d 1072, 1074 (7th Cir. 1992).  Each declaration Defendants challenge here contains a clear statement that the information conveyed is based on the declarant's "personal knowledge."  Thus, despite the defect in the "declaration" line of Overly's submissions, these declarations substantially comply with 28 U.S.C. § 1746, which is all that is required. See Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985).  Accordingly, these declarations shall not be stricken on that basis.

Even a cursory review of the declarations, however, reveals that they are replete with hearsay, speculation, and declarations made without proper foundation.  We therefore note that, although Defendants' request that the Court strike these declarations is <u>denied</u>, statements contained in the declarations which constitute inadmissible hearsay have not been relied upon in the assessment of Overly's claims.

B.      *Plaintiff's Surreply Brief*

In a separately filed motion, Defendants also seek to exclude Overly's Surreply brief on two grounds.[4]  First, Defendants contend that the brief was not filed in a timely manner.  Pursuant to Local Rule 56.1(d), Plaintiff's Surreply brief was originally due on May 18, 2010.  However, Plaintiff sought an extension until May 25, 2010, which the Court granted.  As Defendant correctly points out, the Surreply was nonetheless filed on May 26, 2010, technically a day late.

A technical enforcement of these deadlines in the case at bar would, however, be Kafkaesque, given the circumstances: On the afternoon of May 25, 2010, Plaintiff began attempting to file her Surreply, in accordance with the extension provided. She was unfortunately confronted with technical difficulties in the Court's online filing system, of which she immediately apprised the Court, resulting in her brief being filed at 12:15 AM

---

[4]Plaintiff's "Motion" [Docket No. 127] is actually a response to Defendants' Motion to Strike the Surreply.  Because this is not, in fact, a motion requesting any particular relief, the motion is hereby <u>denied</u> as moot.

on May 26, fifteen minutes late.  Given these extenuating circumstances, we shall not

apply Rule 56(d) fastidiously to bar Plaintiff's brief on timeliness grounds.

Defendants contend, alternatively, that portions of the Surreply brief should be

stricken because they raise new arguments not found in Plaintiff's original Response

brief.  Contrary to Defendants' assertions, however, Overly did not impermissibly raise

any new arguments, but instead simply responded to the opposition's arguments by

elaborating on the facts surrounding her resignation from Key and her testimony as to

Bielecki's response to that resignation.  Building on arguments previously raised, which

is what Overly's Surreply brief does in this instance, was entirely proper.  See, e.g. Lady

Di's, Inc. v. Enhanced Services Billing, Inc., 2010 WL 1258052, at *2 (S.D. Ind. Mar. 25,

2010).[5]  For these reasons, Defendants' Motion to Strike shall be denied.


## II.      Motion for Summary Judgment

### A.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

---

[5]Defendants also challenge the admissibility of two declarations filed in conjunction with
the Surreply, on the same grounds as their challenge to the declarations accompanying the
Response.  Those declarations are admissible as properly authenticated for the reasons discussed
previously, see supra § A.

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of

13

Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

B.     *Hostile Work Environment*

Title VII provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), the Supreme Court clarified that the "terms, conditions, or privileges of employment" language in Title VII encompasses *environmental* conditions of employment, and that the scope of the prohibition "is not limited to 'economic' or 'tangible' discrimination."  Id. at 64.  Therefore, a plaintiff may establish a violation of Title VII by proving that discrimination based on her being a member of a protected class has created for her a hostile or abusive work environment.  In order to rise to the level of a hostile work environment that is violative of Title VII, a plaintiff must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability."  Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 691 (7th Cir. 2005).

In order to determine whether a working environment is hostile in this sense, courts may consider factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

15

Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002), cert. denied, 537 U.S.

820 (2002) (quoting Faragher v.City of Boca Raton, 524 U.S. 775, 787-88 (1998)).

Conduct that is unpleasant, but is not severe or pervasive, will not constitute a hostile

work environment prohibited by Title VII.  See Saxton v. American Telephone and

Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993).

      The sum and substance of Overly's hostile environment claim is that Bielecki's

conduct, which included repeatedly calling her "cutie," interfering with her email printing

function, transferring her most valuable territories to another financial advisor, and

"manhandling" her and calling her a "bitch" upon her resignation, created a hostile work

environment for her.  Even taken together and in a light most favorable to Overly, this

atmosphere was clearly neither severe nor pervasive.  Beilecki's "cutie" comments did

not cross the line from mildly offensive to deeply vulgar or offensive, as required by Title

VII.  See Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

Furthermore, Overly cannot show that the shifts in territory were discriminatory: those

supervisory actions were taken in accordance with a company-wide policy that reflected

trends in the industry, and she has not shown that male employees were offered better

territories than she was.  This allegation, too, is thus inadequate to support a claim of

hostile work environment.  See Harriston v. Chicago Trib. Co., 992 F.2d 697, 705 (7th

Cir. 1993) (holding that assignment to a fallow sales territory was not actionable without

proof that the action was discriminatory).

      The most offensive of Bielecki's alleged actions, that he "manhandled" her said

"Good riddance, bitch," are not actionable for a different reason.  Post-resignation

conduct, in particular conduct that is not grossly offensive and that does not bear a clear

connection to pre-resignation conduct, is not typically actionable under Title VII.  See

Baskerville v. Culligan, 50 F.3d 428, 430-31 (7th Cir. 1995).  Accordingly, because none

of the conduct Overly alleges, considered separately or taken together, is sufficiently

offensive or severe, she cannot succeed on her claim that she was subjected to a hostile

work environment.  See Zirngibl v. Aon Cor., 1996 WL 31152, at *4 (N.D. Ill. Jan. 25,

1996).

*C.*     *Discrimination*

Under Title VII, it is unlawful for an employer "to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  A Title

VII "plaintiff can prove discrimination either by presenting evidence of discrimination

(the 'direct method' of proof)," or by the burden-shifting analysis established in

McDonnell Douglas v. Green, 411 U.S. 792 (1973) (the "indirect method" of proof).

Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631 (7th Cir. 2009).

1.     Direct Method

Under the direct method of proof, a plaintiff must show either "an

acknowledgment of discriminatory intent by the defendant or circumstantial evidence that

17

provides the basis for an inference of intentional discrimination." <u>Gorence v. Eagle Food</u>

<u>Ctrs., Inc.</u>, 242 F.3d 789, 762 (7th Cir. 2001).  "An example of direct evidence would be

an employer's admission that an adverse employment action against an employee based

solely on an impermissible ground." <u>Dandy v. United Parcel Service, Inc.</u>, 388 F.3d 263,

272 (7th Cir. 2004).  Overly simply has not provided evidence of any such action on the

part of Key or its employees.  She has failed to demonstrate a direct connection between

the arguably biased remarks of Bielecki, referring to her as "cutie" and "bitch," which are

the only clear indications of bias in the facts of this case, and any adverse employment

action.

"Circumstantial evidence, on the other hand, may come in the form of 'suspicious

timing, ambiguous statements oral or written, or behavior toward or comments directed at

other employees in the protected group . . . ." <u>Id.</u> (quoting <u>Troupe v. May Dept. Stores</u>

<u>Co.</u>, 20 F.3d 734, 736 (7th Cir. 1994).  Once again, Overly pins her direct proof in this

regard on Bielecki's remarks, in combination with his decision to shift her territory and

his alleged action in limiting her access to customer data.  "[S]tray remarks" may suffice

as circumstantial evidence, but they must still bear a connection to an adverse action

against the claimant.  <u>Id.</u>  Bielecki's "bitch" remark and his alleged "manhandling" of

Overly occurred *after* she resigned and thus cannot reasonably be relied upon to supply

evidence of bias in any of the actions taken by Bielecki prior to that point.  Bielecki's

"cutie" comments are similarly incapable of providing circumstantial evidence of direct

discrimination.  Those remarks were by any measure mild; Key concluded that Bielecki's

actions were unprofessional and made it clear to Overly that the problem had been addressed with Bielecki; and Overly has shown nothing to connect those remarks to any of his other actions. Those remarks are therefore insufficient to establish discrimination under the direct method. Gorence, 242 F.3d at 762 ("[E]vidence of inappropriate remarks not shown to be directly related to the employment decision may not support a direct-method-of-proof case.").

Furthermore, she has not demonstrated that any of the actions–namely, the territory shift and Bielecki's supposed limitation of her customer data access–were even adverse or inappropriate. The territory shift was applied to every financial advisor equally, and she has offered no evidentiary support for her assertion relating to data restriction. Thus, there is simply no direct or circumstantial evidence that any of the actions Overly has cited as "adverse" were the result of discrimination.

2.      Indirect Method

Under the McDonnell Douglas framework, a plaintiff must begin by establishing a *prima facie* case of discrimination. If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff. If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005). The traditional

19

*prima facie* case requires a showing by the plaintiff: (1) that she was part of a class of persons protected by Title VII; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly-situated individuals outside her protected class were treated more favorably.  See Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007).  Key does not challenge the first prong of Overly's *prima facie* case under the McDonnell Douglas framework, to wit, that she was a member of a protected class.  For the reasons discussed below, however, Overly has failed to establish both the second and third prongs of her *prima facie* case of discrimination.

a.      Key's Legitimate Expectations

Overly received a disciplinary memorandum and a fine of $1,000 for violating two Key policies: (1) using a scanned signature to sign customer documents rather than signing those documents herself, in the client's presence; and (2) encouraging her assistants to violate Key policy by selling products they were prohibited from selling. She defends the first action on the grounds that her former supervisor had previously approved of the practice and that it did not run afoul of the applicable NASD rule.  That her former boss had approved of the practice does not, however, negate either the contradirectives of her current supervisor or the fact that her actions were a clear violation of Key's policy, which Overly stated she had read and was familiar with.  Moreover, contrary to her assertion, the practice clearly violated NASD Rules 2110 and 2310, as

explained in her disciplinary memorandum. Indeed, Overly admitted that she "understood that [she] was going to be disciplined for the scanned signature; understood that, and was thankful that they were not terminating [her]." (Dep. of Overly at 141-42.) This admitted misconduct alone demonstrates that she was not meeting Key's legitimate expectations.

She defends her actions in the second regard by asserting that another financial advisor, Kirk Green, also encouraged LRMs to sell prohibited products. She has failed to establish this defense factually, however, because she admitted subsequently that she had no personal knowledge of Green's use of the practice, and she has offered nothing else to show that Green did, in fact, violate this policy. Thus, once again, all that is clear is that Overly admittedly violated a Key policy, and therefore that she did not meet the company's legitimate expectations. The failure to establish this prong of the McDonnell Douglas analysis prevents her from establishing her *prima facie* case of discrimination.


b.    Adverse Employment Action

Because Overly voluntarily resigned her employment at Key, she cannot rely on a wrongful termination as her adverse employment action, and she must therefore establish this prong by another means. She attempts to show that she was constructively discharged, or alternatively, that she suffered a materially adverse employment action. See Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 780 (7th Cir. 2007).

Constructive discharge occurs when an abusive working environment is so

21

intolerable that resignation is an appropriate response.  McPherson v. City of Waukegan, 379 F.3d 430, 440 (7th Cir. 2004).  To meet this standard, the conditions of the plaintiff's employment must have been even more egregious than those necessary for establishing a claim of hostile work environment.  Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004) (holding that, "in the 'ordinary' case, an employee is expected to remain employed while seeking redress.").

As discussed previously, see supra § B, Overly cannot establish that she was subjected to a hostile work environment.  She claims that Bielecki referred to her repeatedly (though fewer than ten times in a two-month period) as "cutie"; that he disabled her email print function (which she offers nothing to prove); that he cut her off from client data; and that her territory was improperly divvied up.  These allegations are entirely inadequate to meet the high standard of proof to establish a constructive discharge.

Furthermore, her allegations that Bielecki restricted her access to client data, which she alleges only generally with no supporting evidence, and that he improperly shifted her territory, are insufficient to establish that she was subjected to a materially adverse employment action:

> for purposes of Title VII, there are three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3)

cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

Nichols, 510 F.3d at 780.   Although the territory shift arguably altered the financial basis for her "compensation," given that it affected her "core deposit base," that action was undertaken as part of a company-wide policy and it is clear from the facts that the shift affected all employees equally.   Further, Overly's contention that Bielecki's restriction of her access to client data "reduced her career prospects" is not supported by any convincing evidence in the record.  See Albiero, 246 F.3d at 933.   Therefore, Overly has not created a genuine issue of material fact as to the existence of an materially adverse employment action.

Accordingly, Overly cannot establish the third prong of her *prima facie* case of discrimination.  Because it is clear that Overly cannot prove at least two of the elements of her *prima facie* case, we need not address the substance of her contention that similarly situated male employees were treated more favorably than she, or the question of pretext, to conclude that she cannot succeed on her claim of discrimination and that Defendants are therefore entitled to summary judgment on that claim.

D.    *Retaliation*

Count II of Overly's Complaint asserts a claim of Retaliation.  Pursuant to the legal protections provided in Title VII, it is unlawful "for an employer to discriminate

against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Overly contends that she was retaliated against in violation of Title VII when some of her territories were shifted to a new financial advisor and when Bielecki interfered with her access to client data, in response to her decision to file a complaint of discrimination with human resources.

As with a claim of discrimination, a plaintiff has two methods of proof available to her to demonstrate retaliation. A plaintiff may prove retaliation either through the direct method of proof or the indirect method, also called the "burden-shifting" method. See Tomanovich v. City of Indianapolis and Indiana Dep't of Transp., 457 F.3d 656, 662 (7th Cir. 2006) (citing Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005)). Here, it is not entirely clear which approach Overly is proceeding under, so we address both analyses. Under the direct approach, a plaintiff must present sufficient evidence to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009). As discussed previously, see supra § C.2.b, she has failed to show that she suffered an adverse employment action, which prevents her from establishing a case of retaliation under the direct method.

To prove retaliation under the "indirect method, the plaintiff must establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse

employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." Moser, 406 F.3d at 903. "If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action." Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7 Cir. 1998). "If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual." Moser, 406 F.3d at 904.

Once again, Overly cannot establish that she met Key's legitimate expectations, nor that she suffered an adverse employment action. See supra § C.2.b. These failures are fatal to her case of retaliation under the indirect method.

For the foregoing reasons, Overly has failed to create a material issue of fact as to her claim of retaliation, and Key is entitled to summary judgment on that claim as well.

## III.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED; Defendants' Motion to Strike is DENIED; and Plaintiff's "Motion" is DENIED.

IT IS SO ORDERED.

Date:___06/23/2010_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

25

Michael C. Kendall
KENDALL LAW OFFICE
mckatlaw@aol.com

Amy Suzanne Wilson
FROST BROWN TODD LLC
awilson@fbtlaw.com

Heather L. Wilson
FROST BROWN TODD LLC
hwilson@fbtlaw.com